**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KATHY A. BOOKOUT,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:06-CV-294-Y** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

A.      STATEMENT OF THE CASE

Plaintiff Kathy A. Bookout brings this action pursuant to Section 405(g) of the Social

Security Act, Title 42 of the United States Code, for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title II

of the Social Security Act. Bookout applied for disability insurance benefits on November 21, 2000,

claiming disability commencing March 9, 2000. She met the insured status requirements at all times

relevant to the Commissioner's decision.

Bookout's application for benefits was denied initially and on reconsideration, and Bookout

proceeded to a hearing before an administrative law judge (the "ALJ"). ALJ James Wendland held a hearing, and on August 22, 2002, issued a decision that Bookout was not disabled or entitled to a period of disability insurance benefits. (Tr. 10-16). Bookout sought judicial review of that determination, and on May 11, 2004, the district court reversed and remanded the Commissioner's decision for further administrative proceedings. *Bookout v. Barnhart*, Civil Action No. 4:03-CV-316-A (N.D. Tex. May 11, 2004). In accordance with the court's order, the Appeals Council vacated the administrative decision and remanded the case to the ALJ. (Tr. 300).

ALJ Wendland held a second hearing on October 31, 2005, in Fort Worth, Texas. (Tr. 381-415). Bookout attended with her non-attorney representative, and a vocational expert also testified. On December 12, 2005, the ALJ issued a decision that Bookout was not disabled or eligible for benefits because she retained the ability to perform a modified range of light work activity. (Tr. 267-75). Bookout seeks judicial review of this unfavorable determination.[1]

## B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the

---

[1] In cases remanded by the district court, the ALJ's decision on remand becomes the final decision of the Commissioner unless the claimant files exceptions to that decision or the Appeals Council otherwise assumes jurisdiction of the case. *See* 20 C.F.R. § 404.984(d).

use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir. 1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in

the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000).

C.      ISSUES

>   1.      Is there is substantial evidence to support the ALJ's assessment of Bookout's mental residual functional capacity (RFC)?

>   2.      Did the ALJ comply with the relevant administrative regulations in his assessment of Bookout's mental RFC?

>   3.      Is the vocational expert testimony reliable?

D.      ADMINISTRATIVE RECORD

1.      Medical History

Bookout was born May 13, 1960, and was thirty-nine years old on her alleged onset date of March 9, 2000. She completed one year of college, and worked for American Airlines as a reservations agent from 1986 to 2000. She stopped working in March 2000 due to fibromyalgia,[2]

---

[2] Fibromyalgia is a group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures. MERCK MANUAL OF DIAGNOSIS AND THERAPY 481-82 (17th ed. 1999).

migraine headaches, mild asthma, and depression.[3]

Bookout's medical history documents chronic complaints of pain and fatigue, as well as a history of depression. (Tr. 118-40). During a visit with physician Caroline Woodland, M.D., on February 24, 2000, Bookout reported diffuse body pain that had caused her to miss eleven days of work. (Tr. 110). Bookout was distraught because she had tried a variety of therapeutic measures and different medications, but nothing helped the pain. (Tr. 110). Bookout changed antidepressant medications, but saw little improvement in her depression. Woodland referred Bookout to a pain management clinic. (Tr. 110).

Bookout sought treatment from pain medicine specialist Andrew Klymiuk, M.D., in March 2000. (Tr. 239). Sandra Haram, Ph.D., conducted an intake interview, during which Bookout reported depression beginning in 1995 and episodes of anxiety two or three times a month. Bookout had never participated in therapy or been hospitalized for psychiatric reasons. (Tr. 240). Her current stressors were her inability to work and her discomfort. Bookout was groomed and cooperative. Her psychomotor activity was normal, and her mood was euthymic with a congruent affect. She estimated that she slept a total of four or five hours per night, with the longest uninterrupted period of sleep lasting two hours. (Tr. 241). Her energy was diminished, but she had no concentration or motivation problems. Haram noted that Bookout's memory was normal for immediate, recent, and remote events. Bookout reported feeling guilty about not working. On her bad days, she would get up, shower, then rest. If she felt better, she would run errands, work on her

---

[3] A limited review of Bookout's medical history is appropriate because Bookout challenges only the ALJ's assessment of her mental residual functional capacity (RFC). She does not challenged the ALJ's determination at the first three steps of the sequential evaluation process or the ALJ's assessment of her physical RFC.

computer, or meet with friends. Bookout was unable to make advanced plans with others because she never knew how she would be feeling. (Tr. 241).

Haram's impression was major depressive disorder and possible anxiety disorder. Haram assessed a current Global Assessment of Functioning (GAF) score of 35,[4] and opined that Bookout was unable to function normally and could not work in her current condition. (Tr. 242). Bookout also underwent personality testing that indicated she might be inclined to repress her emotions, which could exacerbate physical problems and impair her ability to cope. (Tr. 247).

At a check-up with Klymiuk on May 18, 2000, Bookout was alert, awake, and oriented. (Tr. 227). She was in no apparent distress, and her mood was euthymic. Her thought process was coherent and logical, her concentration and attention span were within normal limits, and her insight and judgment were good. (Tr. 227). In July 2000, Bookout's depression was better with the use of Effexor. Her mood was euthymic and her affect was full. (Tr. 217). In October, Bookout reported an increase in her pain and depression. (Tr. 213). During a check-up in November 2000, Bookout said her medications and use of a paraffin bath were beneficial. (Tr. 210). She was using an Alpha stimulator daily, which relaxed her and helped her mood. Bookout was taking Effexor, but continued to have mood fluctuations and difficulty sleeping. She also reported some problems with her concentration and short-term memory. (Tr. 210). Klymiuk urged Bookout to consider volunteer work to help both her physical and emotional condition. Bookout was referred to an anesthesiologist

---

[4] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 35 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* at 34.

for evaluation of available pain relief procedures.

In January 2001, Bookout reported that an epidural steroid injection administered by the anesthesiologist had been beneficial, (Tr. 204), but she had recently changed health insurance providers and the shots would no longer be a covered expense. (Tr. 201). Her mood was stable, but she felt frustrated by her lack of energy. (Tr. 201). On March 29, 2001, Bookout was depressed and crying because of her pain. Klymiuk increased the dosage of Bookout's antidepressant and added a mood stabilizer to Bookout's medications. Bookout was scheduled to return in two months. (Tr. 199). In May 2001, Bookout reported doing much better and said her spirits were improving. (Tr. 198). She was trying to exercise, sunbathe, and do other things that made her feel better. (Tr. 198). Progress notes from August 9, 2001 indicate that Bookout was having more pain, which disrupted her sleep. She was swimming for exercise, but sometimes exercising caused more pain. (Tr. 196).

Bookout underwent a consultative internal medicine examination on March 19, 2001. (Tr. 146). She complained of a three-year history of generalized muscular pain, which had worsened after she had a hysterectomy. She also suffered from depression and stated that her condition varied, but improved with medication. (Tr. 146). Bookout complained of chronic sleep problems and daytime fatigue. The consultative physician attributed Bookout's sleep disturbances to depression or fibrositis.[5] (Tr. 148).

Bookout also saw Tara Reddy, M.D., for a psychiatric evaluation on March 19, 2001. Bookout reported feeling depressed because of her physical condition. (Tr. 150). She complained

---

[5] Fibromyalgia is also referred to as fibromyositis or fibrositis. TABER'S CYCLOPEDIC MEDICAL DICTIONARY 670, 671 (16th ed. 1989).

of chronic fatigue and insomnia, an inability to focus and concentrate, and decreased appetite  She was frustrated that she could no longer do the things she used to do.  Bookout took Effexor daily and said the medication was helpful.  She had no prior episodes of depression, no hospitalizations for psychiatric reasons, and no psychotic or panic disorder symptoms.  (Tr. 150).

Bookout was appropriately dressed and groomed.  She made good eye contact during the interview and her psychomotor activity was within normal limits.  Bookout demonstrated coherent speech without loose associations, and she denied any auditory or visual hallucinations.  Her mood was dysphoric with an appropriate affect.  Her remote memory was good, and recent and immediate recall were excellent.  Bookout's concentration and judgment were intact, her insight was good, and impulse control was intact.  (Tr. 151).

Bookout stated that she arose around 9 a.m. each day and went to bed around 11:30 p.m. or midnight.  She did some cooking and cleaning, shared laundry chores with her mother, drove, shopped, and handled her own mail.  She reported getting along fairly well with people.  (Tr. 151).  Reddy noted that Bookout's concentration was intact, but pace and persistence were slowed due to Bookout's physical problems.

Reddy diagnosed major depression, single, moderate, and in partial remission.  Reddy assessed a current Global Assessment of Functioning (GAF ) score of 60,[6] with a previous GAF score of 58.  Bookout's prognosis was good with treatment.  (Tr. 152).

State agency physician Farrell Hillman, a psychiatrist, assessed Bookout's mental residual

---

[6] A GAF score of 51-60 reflects  moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.

functional capacity in April 2001. (Tr. 164-83). He opined that Bookout suffered from an affective disorder (major depression) that caused no restrictions in her activities of daily living, moderate difficulty in social functioning, and mild difficulty maintaining concentration, persistence or pace. There were no episodes of decompensation of extended duration. (Tr. 180).

Hillman assessed no significant limitations in Bookout's ability to remember locations and procedures; understand, remember, and carry out simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine; and make simple work-related decisions. (Tr. 164). Bookout also had no significant limitations in her ability to interact appropriately with the public; ask questions and request assistance; accept instructions and respond appropriately to criticism; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior. (Tr. 165). Hillman assessed Bookout as moderately limited in her ability to understand, remember, or carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination and proximity to others without being disturbed by them; complete a normal workday and workweek without interruptions from psychological symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 164-65). Hillman concluded that Bookout was capable of handling simple instructions and making simple decisions in a low-stress environment. (Tr. 166). A second state agency physician, Lyman Phillips, M.D., concurred with Hillman's conclusions. (Tr. 167).

Rheumatologist Lige Rushing, M.D., examined Bookout in November 2002, apparently at the request of Bookout's insurance carrier. (Tr. 347). Rushing found that Bookout was tender at

all eighteen tender points, which was consistent with the American College of Rheumatology standards for a diagnosis of fibromyalgia. Rushing also noted that fibromyalgia has both physical and psychological components, (Tr. 351), and opined that Bookout was unable to perform full-time sedentary work because of her perceptions about her limitations. (Tr. 352).

Bookout continued to see Klymiuk for pain management through 2005. In April 2005, Bookout's condition was assessed as stable, but she was unable to afford her current medications. Klymiuk changed Bookout's pain medication to methadone, but in October 2005, Klymiuk opined that Bookout's condition was deteriorating, with increased pain, decreased functioning, and more pronounced depression. (Tr. 372).

2.     First Administrative Hearing

Bookout was forty-two years old on the date of the administrative hearing. (Tr. 34). She testified that she stopped working because it was too painful for her to sit at her computer terminal. The pain had started in her buttocks, hips, and groin, but had progressed to her shoulders, legs, and knees. (Tr. 36-37). She performed stretching exercises daily and walked on her treadmill for about ten minutes each afternoon. (Tr. 39-40). Bookout also complained of severe headaches for the past year and a half, although medication dulled the pain. (Tr. 40). She experienced intense migraine headaches once or twice a month, and had to lay down with a heating pad on her head for relief. (Tr. 40). She also had mild asthma, and used an inhaler as necessary. (Tr. 41-42).

Bookout testified that she suffered from depression, which she attributed to not working, losing her friends, chronic pain, and a diminished quality of life. (Tr. 42). Bookout's day began with stretching exercises. She also watched television or read magazines, but testified that she did

not have sufficient concentration to read books. She cooked microwaveable meals or bought prepared foods. Bookout neglected her housework. She testified that she went grocery shopping once a week and put the groceries away, but the activity tired her out for the remainder of the day. (Tr. 43). Bookout tended to her own personal hygiene, and helped her mother with the laundry. (Tr. 44). Bookout was able to drive a car, but sitting in the car bothered her. She did not go to the movies, but rented movies to watch at home. She shopped for necessary items, but avoided going to the mall.

Bookout testified that she had problems remembering things. She had been taking the antidepressant Effexor for two years, and saw her doctor every two months. (Tr. 46-47). None of her medications caused side-effects, but she felt nauseous when using her Alpha stimulator. (Tr. 47). She planned on joining a fibromyalgia support group, and also had two friends that she talked with by telephone. One of her friends lived nearby and came over occasionally to help her. (Tr. 48). Bookout denied feeling suicidal, but was irritated when she did stupid things or misplaced items. (Tr. 48). Bookout also had difficulty sleeping, which she blamed on pain. (Tr. 51).

Bookout experienced crying episodes about twice a month that might last a few minutes or all day. (Tr. 53). She reported a decreased appetite, and her weight fluctuated. She used to enjoy bowling, camping, traveling, and having friends over for dinner, but now had no hobbies except reading. (Tr. 54). She had a very low energy level. She had difficulty maintaining concentration, and had to stop and think carefully when performing tasks like paying her bills. She felt guilty that she was not a working, productive person. (Tr. 56).

3.     Second Administrative Hearing

At the hearing in October 2005, Bookout testified that she continued to see Klymiuk for management of her fibromyalgia and depression. (Tr. 385-86). She testified that her pain and fatigue were worse, and she had developed knee problems, although the most severe pain remained in her hips, low back, and tail bone. Although her medications helped, nothing totally alleviated the pain. (Tr. 387).

Bookout testified that she felt useless, out of sorts, and hopeless about her situation. (Tr. 387). She had lost friends because her physical limitations prevented her from visiting or socializing, but also testified that she got along pretty well with people, which she attributed to her experience working with the public. (Tr. 388). Bookout testified that she lived alone. She spent most days lying on the couch or bed and watching television or reading magazines. (Tr. 389). Her neighbors helped her with the grocery shopping, laundry, errands, and lawn work. (Tr. 389-90).

Vocational expert Todd Harden testified that Bookout's previous work as an airline reservations agent was semi-skilled, sedentary work. (Tr. 401). The ALJ then asked Harden to consider a series of hypothetical situations, including the following: an individual of Harden's age, education, and work experience who retained the capacity for light work that did not require her to stoop, balance, crouch, crawl, kneel, or climb stairs and ramps more than occasionally; climb scaffolds, ladders, and ropes; sit for more than fifteen minutes without the opportunity to stand; stand or walk for more than four hours during an eight-hour workday; handle or finger objects more than frequently; work with more than a mildly decreased ability to maintain attention and concentration; understand, remember and carry-out more than simple instructions; or repetitively push, pull, or perform extended reaching with the upper extremities. (Tr. 401-02, 404).

Harden testified that an individual with the foregoing restrictions could work as an automobile self-service attendant, a service-establishment attendant, a gate guard, or a storage facility rental clerk. (Tr. 402, 405, 408). Harden testified that none of his testimony conflicted with the <u>Dictionary of Occupational Titles</u> (DOT). (Tr. 408). In response to questions from Bookout's representative, Harden testified that a person with moderate difficulty maintaining attention and concentration or moderate difficulty completing a normal workday or workweek because of psychologically based symptoms would have difficulty with sustained employment. (Tr. 412).

4.      ALJ Decision

The ALJ found that Bookout had not engaged in substantial gainful activity since March 9, 2000, and further found that Bookout had severe impairments, including back pain, joint pain, fibromyalgia and depression. (Tr. 268). However, the ALJ determined that Bookout's impairments did not meet or equal the severity of any impairment included in the Listing of Impairments. (Tr. 268). After a review of the evidence and Bookout's subjective complaints, the ALJ concluded that Bookout retained the residual functional capacity for light work with the following limitations: not required to stoop, crouch, crawl, kneel, or climb stairs or ladders more than occasionally; no climbing of scaffolds, ladders, or ropes; sitting for no more than fifteen minutes at a time without the opportunity to stand; standing or walking no more than four hours out of an eight-hour workday; no repetitive pushing, pulling, or extended reaching with the upper extremities; not required to handle or finger objects more than frequently; not required to work with more than a mildly decreased ability to maintain concentration and attention; and not required to understand, remember, and carry out more than simple instructions. (Tr. 273).

The ALJ found that Bookout could not perform her previous work, but based on the vocational expert's opinion, found that there were a significant number of other jobs that she could perform. (Tr. 275). Accordingly, the ALJ concluded that Bookout was not disabled or entitled to disability insurance benefits. (Tr. 275).

E.     DISCUSSION

1.     Residual Functional Capacity Assessment

Bookout contends that the assessment of her mental residual functional capacity (RFC) is not supported by substantial evidence, particularly medical opinion evidence. She concurs with the ALJ's determination that she is limited to simple instructions and has an impaired ability to concentrate, but asserts that her mental impairment imposes more than just these two limitations.

Bookout's complaints focus on the ALJ's alleged failure to weigh the state agency psychiatrist's opinions in accordance with social security regulations and rulings.[7] Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from nonexamining sources) at both the administrative hearing and Appeals Council levels of administrative review. 20 C.F.R. §404.1527(f); SOCIAL SECURITY RULING 96-6p. The ALJ and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SOCIAL SECURITY RULING 96-6p.

---

[7] Bookout complains that the ALJ failed to comply with the district court's previous order remanding the case for further administrative proceedings. Compliance with a previous court order, however, is not the relevant inquiry. The court reviews the Commissioner's decision only to ensure that correct legal standards were followed and that substantial evidence supports the decision. *See Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).

In addition, Social Security Rulings are published under authority of the Commissioner and are binding on the Administration. *Hall v. Schweiker*, 660 F.2d 116, 119 n.4 (5th Cir. [Unit A] 1981)(per curiam). An agency must follow its own procedures, even if those procedures are more rigorous than what would otherwise be required. *Hall*, 660 F.2d at 119, *cited in Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000). If the agency violates its internal rules and prejudice results, the proceedings are tainted and any action taken cannot stand. *Hall*, 660 F.2d at 119. Bookout contends that prejudice exists because the vocational expert testified that a person with all of the moderate areas of limitation that Hillman assessed could not perform competitive employment.

The ALJ provided the following discussion of HIllman's assessment:

> Another medical doctor (a psychiatrist) evaluated the medical evidence and concluded that the claimant's depression did not significantly limit her ability to understand or her memory. Described as "moderately limited" was the ability to carry out detailed instructions, maintain attention and concentration for extended periods, or work in coordination or proximity to others without being distracted by them. The claimant's ability to maintain social functioning was described as "moderately" affected.

> However, at the hearing the claimant said that she gets along pretty well with people. She said that she has lost some friends due to her not being able to go out anymore, but she did not allege any social functioning problem. A review of the medical notes never refer to the claimant having social functional problems.

> There is virtually no evidence of a significant depressive or anxiety disorder. I have concluded that the claimant has a slight restriction of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.

(Tr. 272)(record citations omitted). Bookout asserts that this discussion is insufficient because it does not address Hillman's opinions that she needs a low-stress environment and that she is impaired

in her ability to work in coordination with others, her ability to complete a normal workday or workweek, and her ability to work at a consistent pace.  Bookout asserts that the ALJ, by failing to address these specific opinions, implicitly found that she has no impairment in the foregoing activities.  She also complains that the ALJ failed to cite any of the relevant factors outlined in Section 404.1527(d) in his discussion of Hillman's opinions.  *See generally* 20 C.F.R. § 404.1527(d).

The ALJ did not explicitly state the amount of weight he was assigning to Hillman's opinions or refer to each individual finding contained within Hillman's assessment, but his review of the state agency consultant's findings demonstrates that the ALJ satisfied the regulations and rulings that require him to consider the medical opinions offered by state agency medical consultants.  Although the ALJ did not expressly refer to the Section § 404.1527(d) factors, his opinion also reflects that he understood Hillman's role in the proceedings and he considered the medical opinions rendered in earlier stages of the administrative proceedings in light of the record as a whole.  Bookout cites no authority that requires an ALJ's express reference to the regulations when weighing a non-examining medical source's opinions under circumstances similar to her case.

Bookout further complains that the state agency medical consultants provided the only available medical opinions about her capacity for mental work activities, yet the RFC assessment materially differs from these opinions.  An ALJ should usually request a medical source statement about the types of work that a claimant is still capable of performing, but the lack of such a statement does not necessarily make the record incomplete.  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  Instead, the inquiry focuses upon whether the ALJ's decision is supported by substantial

evidence in the existing record. *Id.*

Bookout complains that the mental RFC assessment lacks substantial supporting evidence in light of the ALJ's failure to address evidence provided by her mental health providers, consultative examiner Tara Reddy, or rheumatologist Lige Rushing. The ALJ cannot pick and choose among the evidence, but need not mention each and every piece of evidence in the file so long as he has developed the record fully and fairly and has sufficiently articulated the basis for his decision. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996); *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993). The objective evidence establishes that Bookout's depression was responsive to treatment, and even Bookout's testimony reflects that most of her limitations were the result of physical impairment, not her mental condition. The state agency medical consultants also observed that the results of Reddy's consultative psychiatric evaluation were within normal limits. (Tr. 182).

Although the ALJ did not refer to every document in Bookout's file, the ALJ sufficiently articulated the basis for his decision, and the record provides substantial supporting evidence for that decision. Nor has Bookout demonstrated that the ALJ violated relevant administrative regulations and rulings in his consideration of the state agency medical consultant's opinions and his assessment of Bookout's mental RFC.

2.    Vocational Expert Testimony

Bookout contends that the vocational expert testimony is unreliable, and therefore, the ALJ's determination that she can perform other work is unsupported by substantial evidence. More specifically, she contends that there is an unresolved conflict between the vocational expert's testimony and the <u>Dictionary of Occupational Titles</u> (DOT).

The Social Security Administration issued Ruling 00-4p to clarify the use of vocational experts and other occupational information in the disability determination process. *See generally* SOCIAL SECURITY RULING 00-4p. The ruling places an affirmative duty on the adjudicator to inquire into possible conflicts between vocational expert evidence and the DOT. *See id.* Although Ruling 00-4p indicates an agency policy of placing primary reliance on the DOT, the Ruling cautions that neither the DOT nor the vocational expert's evidence will automatically "trump" in cases of conflict, and vocational experts may be used at Steps Four and Five to resolve complex vocational issues. *See id.* The Ruling notes that the DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as performed in a specific setting, while a vocational expert may be able to provide more specific information about a job or occupation. *Id.* The Fifth Circuit has adopted a similar prudent approach and holds that neither the DOT nor the vocational expert evidence is *per se* controlling: When faced with a conflict between the vocational expert and the DOT, the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis to do so. *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000).

The ALJ specifically asked the vocational expert if his testimony conflicted with information in the DOT, but the vocational expert testified that there was no conflict to the best of his knowledge. (Tr. 408). The vocational expert named four possible occupations for a person with Bookout's work-related limitations: automobile self-service attendant, service-establishment attendant, gate guard, and storage facility rental clerk. Bookout, however, contends that each of jobs identified by the vocational expert are incompatible with her need for simple instructions because the DOT specifies that the jobs require a Reasoning Development of 3. *See* DICTIONARY OF

OCCUPATIONAL TITLES (DOT) §§ 295.367-026, 369.477-014, 372.667-030, 915.477-010 (rev. 4th ed. 1991). "Level 3" reasoning skills require commonsense understanding to carry out instructions furnished in a written, oral, or diagrammatic form and deal with problems involving several concrete variable in or from standardized situations. *See id.* app. C (Scale of General Education Development). Bookout argues that this definition encompasses more complex tasks than she is capable of performing with her given residual functional capacity.

Bookout relies on case law from the Court of Appeals for the Tenth Circuit. *See Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005). The court considered whether the vocational expert's testimony that a claimant limited to simple, routine tasks could perform the work of call-out operator or surveillance-system monitor when the DOT indicated that both jobs required a reasoning level of three. *Id.* at 1176. The court found that level-three reasoning requirements appeared to be inconsistent with Hackett's RFC and remanded the case to the administrative level to address the conflict between the vocational expert's testimony and the DOT. *Id.*

Bookout also cites a similar result reached in *Augustine v. Barnhart*, 2002 WL 31098512 (E.D. Tex. Aug. 27, 2002). The ALJ found Augustine was limited to sedentary work consisting of only simple, repetitive tasks and instructions, which precluded him from performing his past relevant work. *Id.* at *5. Based on vocational expert testimony, however, the ALJ found Augustine was capable of performing other work existing in significant numbers in the national economy. *Id.* The district court reversed the decision, finding that the vocational expert's testimony about suitable jobs was in direct conflict with the DOT designations, which identified the jobs as heavier in exertion and requiring level-three reasoning. *Id.* at *8-9. In particular, the court found that a reasoning level

of three exceeded Augustine's ability to perform no more than simple, repetitive tasks. *Id*. The Commissioner's decision was reversed and remanded for further development and clarification of the vocational evidence. *Id*. at *10.

The Commissioner responds to Bookout's argument by asserting that there is no conflict with respect to at least one of the jobs identified by the vocational expert because the DOT defines the job of storage facility rental clerk as unskilled work, with a specific vocational preparation (SVP) level of 2, despite the job's level-three reasoning requirements.[8] *See* DOT § 295.367-026. The Commissioner argues that unskilled work is consistent with understanding, remembering, and carrying out simple instructions.

The DOT defines SVP levels as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. *See id.* app. C (Specific Vocational Preparation). Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; ; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher. *See id.*; SOCIAL SECURITY RULING 00-4p. The administrative regulations similarly define unskilled work as work that needs little or no judgment to do simple job duties that can be learned on the job in a short period of time. 20 C.F.R. § 404.1568(a). But if the court limited its consideration to the amount of time required to learn a particular job, then other components of the

---

[8] The vocational expert recognized that service-establishment attendant, gate guard, and automobile self-service attendant are semi-skilled jobs, but then conceded that semi-skilled jobs would be inconsistent with a limitation to simple instructions. (Tr. 409, 411). *See also* DICTIONARY OF OCCUPATIONAL TITLES §§ 369.477-014, 372.667-030, 915.477-010 (rev. 4th ed. 1991).

DOT classification system–including the reasoning level for a given occupation–would be rendered meaningless. The Commissioner's efforts to equate job training requirements with the mental demands of a job are unpersuasive.

Bookout has established an inconsistency between the DOT and the vocational expert testimony that was not recognized during the administrative proceedings. Because no conflict was recognized, neither the ALJ nor the vocational expert identified plausible reasons for crediting the vocational expert over the DOT information. Remand is warranted so that the vocational conflict can be resolved.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further proceedings consistent with these proposed findings of fact and conclusions of law.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until October 1, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28

U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until October 1, 2007, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED SEPTEMBER 10, 2007.


_____/s/___Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE